UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

EASTERN ASSOCIATED COAL CORP.

      Plaintiff

v.                                    Civil Action No. 2:04-0641

DISTRICT 17 and LOCAL UNION 9177,
UNITED MINE WORKERS OF AMERICA

      Defendant

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending are the parties' cross motions for summary judgment.  On June 20, 2005, plaintiff Eastern Associated Coal Corp. ("Eastern") filed its motion.  On June 14, 2005, defendants District 17 and Local Union 9177 (collectively the "union") filed their motion for summary judgment.

I.

      Eastern utilizes a preparation plant ("plant") as part of its West Virginia operations.  (Award at 3).  During a vacation shutdown of the plant in 2003, Eastern hired an outside contractor to perform certain work on its premises.  (<u>Id.</u> at 4).  The union concluded that the contracted work was reserved to it under the governing 2002 National Bituminous Coal Wage Agreement

("Agreement"), and it filed the following grievance on July 22, 2003:

> The company is in violation of the 2002 NBCWA by contracting out repair and maintenance work.  Eastern used a contractor to cut out and remove concrete at the tail of 437 belt.  We are asking to be made whole on all wages and benefits.

(Id.)[1]  Arbitrator Edwin R. Render presided and sustained the grievance in a 21 page decision.  Eastern does not challenge that portion of the arbitrator's conclusion finding that it violated the Agreement.  (Pl.'s Mem. in Supp. at 4).

At the conclusion of his now-uncontested liability finding, however, the arbitrator additionally awarded unspecified damages and stated, without elaboration, that "the union is entitled to be compensated for the amount of the time that the outside contractor spent tearing out the concrete and removing it from beneath the 437 belt."  (Award at 21).

On June 23, 2004, Eastern instituted this action pursuant to, inter alia, Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  (Compl. ¶ 1).  It contends that the award's remedy is punitive because no classified employee actually suffered a loss as a result of the

---

[1]The Agreement is a collective bargaining accord effective from January 1, 2002, through December 31, 2006.  (Compl. ¶ 2).

Agreement's breach. (Compl. ¶ 21).  The union contends the award

was lawful in all respects.  (Def.'s Resp. at 6).


                                 II.


          At the time of these events, the company employed

approximately 70 individuals at the plant.  (Award at 4).  During

the spring and early summer of 2003, Eastern made a list of

projects, including the grieved work, that it wanted to complete

during the vacation shutdown of the plant from June 28 through

July 11.  (Id. at 4-5).  Eastern posted a notice for its

employees concerning its plan.  (Id. at 6).  Several employees

signed a list indicating their desire to work on the projects

during the vacation shutdown.  (Id.)  Eastern's schedule

contemplated working all employees who volunteered for up to

eight hours per day on two different shifts.  (Id.)


          Eastern believed it could do the work with the

classified-employee volunteers during the vacation period.  (Id.)

The schedule was impacted heavily, however, by other, unforeseen

repairs that required immediate attention.  (Id.)  Additionally,

Eastern's efforts on the grieved work did not go as planned.  As

a result of unexpected conditions that are not material, an

outside contractor then working at the Eastern site on another

project was retained to, inter alia, remove and replace concrete

                                  3

in the area surrounding the location of the grieved work.  (<u>Id.</u> 8-9).

The individual who signed the grievance, James Jarrell, worked during the vacation period.  According to the arbitrator, Jarrell:

> knew what work union members had performed at the . . . plant in the past.
>
>       . . . .
>
> Mr. Jarrell also said that there are company employee[s] who could have accomplished nearly all of the work done by the outside contractor on July 4 had they been allowed to do it.  He said that the basic problem giving rise to this grievance was the fact that the company underestimated the amount of work that it needed to do during the vacation shutdown.  He said that the company has called people out to work during the vacation shutdown in the past.

(<u>Id.</u> at 10-11).  Additionally, one employee testified at the arbitration hearing that although he did not sign up for the work until the list was posted, he later volunteered and was told he was not needed.  (<u>Id.</u> at 12).

In the section of the award entitled "Position of the Union[,]" the following representation appears: "The union also argues that in this case 24 bargaining unit employees were not allowed to work during the vacation shutdown.  These employees were entitled to work before the company hired an outside contractor."  (<u>Id.</u> at 13).  The concluding sentence of this

section of the award states the union's request "that the
employees be made whole."   (<u>Id.</u> at 14).


        In the section of the award entitled "Position of the
Company[,]" the following discussion appears:

>  Bargaining unit employees do not normally do
>  construction work.  Moreover, employees were not
>  available.  The company notes that when it posted a
>  notice asking employees if they desired to work during
>  the vacation shutdown . . . [a]pproximately 20
>  employees declined.  All 71 employees were given the
>  opportunity to work.  After the sign up was posted the
>  company could not, consistent with the contract, allow
>  employees who had opted for a two week vacation to work
>  on this project.  This is because under the labor
>  agreement employees are entitled to two consecutive
>  weeks of vacation.
>
>  The company simply did not have the option of forcing
>  other employees to work during the vacation period.
>  The only time that the company has ever called
>  employees in during the vacation shutdown was during
>  the final two or three days of the shutdown in order to
>  get the first shift after the end of the shutdown under
>  way.  The company has never called employees to work
>  during the middle of the vacation shutdown period.

(<u>Id.</u> 15-16).


        As noted, the arbitrator sustained the grievance,
concluding that Eastern violated the Agreement by hiring the
outside contractor to cut out and remove the concrete from
beneath the 437 belt.  (<u>Id.</u> at 17).  The arbitrator provided
extensive reasoning to support his finding of an Agreement
violation but, from the standpoint of a remedy, he stated only

"the union is entitled to be compensated for the amount of the time that the outside contractor spent tearing out the concrete and removing it from beneath the 437 belt."  (Id. at 21).


                              III.


A.   The Standard of Review

          Our court of appeals has frequently identified the polar star guiding any court confronted with a vacatur or enforcement request:  "[J]udicial review of arbitration awards is extremely limited -- in fact, it is 'among the narrowest known to the law.'" U.S. Postal Service v. American Postal Workers Union, AFL-CIO, 204 F.3d 523, 527 (4th Cir. 2000) (quoting Union Pac. R.R. v. Sheehan, 439 U.S. 89, 91 (1978) (internal quotation marks omitted); see also District 17, UMWA v. Island Creek Coal Co., 179 F.3d 133, 136-37 (4th Cir. 1999); Westvaco Corp. v. United Paperworkers Int'l Union AFL-CIO, 171 F.3d 971, 974 (4th Cir. 1999) ("Absent the most unusual of circumstances, courts must uphold and enforce arbitral awards."); Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc., 142 F.3d 188, 193 (4th Cir. 1998); Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Intern. Union, 76 F.3d 606, 608 (4th Cir. 1996) ("[T]he judiciary is to

                              6

presumptively favor the award's validity. . . .[A]bsent any fraud by the parties or dishonesty by the arbitrator, an arbitrator's findings should never be overturned."); Island Creek Coal Co. v. District 28, UMWA, 29 F.3d 126, 129 (4th Cir. 1994); Norfolk & Western Ry. Co. v. Transportation Communs. Int'l Union, 17 F.3d 696, 700 (4th Cir. 1994); District 17, UMWA v. Apogee Coal Co., 13 F.3d 134, 138 (4th Cir. 1993); Zady Natey, Inc. v. United Food and Comm. Workers Int'l Union, Local No. 27, 995 F.2d 496, 498 (4th Cir. 1993).

     The court of appeals has likewise noted that "[w]hen the parties bargain for an arbitrator's construction of a contract, 'the courts have no business overruling him because their interpretation of the contract is different from his.'" United States Postal Serv. v. American Postal Workers Union, AFL-CIO, 204 F.3d 523, 527 (4th Cir. 2000) (quoting Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 599 (1960)); see also District 17,179 F.3d at 137; Westvaco, 171 F.3d at 975; Island Creek, 29 F.3d at 129; Zady, 995 F.2d at 497-98. "Indeed, 'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.'" U.S. Postal,  204

F.3d at 527 (quoting <u>United Paperworkers Int'l Union v. Misco,</u> <u>Inc.</u>, 484 U.S. 29, 38 (1987)); <u>see</u> <u>also</u> <u>Rock-Tenn Co. v. United</u> <u>Paperworkers Int'l Union AFL-CIO</u>, 184 F.3d 330, 337 (4th Cir. 1999) (observing "A court 'should not reject an award on the ground that an arbitrator misread the contract" if "the arbitrator is even arguably construing or applying the contract.'") (quoted authority omitted); <u>see</u> <u>also</u> <u>District 17</u>, 179 F.3d at 137; <u>Westvaco</u>, 171 F.3d at 975; <u>Champion Intern.</u> <u>Corp. v. United Paperworks Intern. Union, AFL-CIO</u>, 168 F.3d 725, 728 (4th Cir. 1999); <u>CSX Transp., Inc. v. United Transp. Union</u>, 29 F.3d 931, 933, 938 (4th Cir. 1994); <u>Norfolk & Western</u>, 17 F.3d at 700; <u>Zady</u>, 995 F.2d at 497-98.  Among other things, the court is bound to unquestioningly accept the arbitrator's factual findings.  <u>District 17</u>, 179 F.3d at 138.

    The supporting rationales behind this laissez-faire policy are quite compelling.  For example, "[i]f courts were allowed to delve into the merits of an arbitration award, then the federal policy of settling labor disputes by arbitration would be seriously undermined."  <u>U.S. Postal</u>, 204 F.3d at 527; <u>see</u> <u>United Steelworkers of Am. v. Enterprise Wheel & Car Corp.</u>, 363 U.S. 593, 596 (1960); <u>see</u> <u>also</u> <u>District 17</u>, 179 F.3d at 137; <u>Westvaco</u>, 171 F.3d at 974, 977.  A review and enforcement scheme

8

that employed "'judicial second-guessing . . . would transform a
binding process into a purely advisory one, and ultimately impair
the value of arbitration for labor and management alike.'" U.S.
Postal, 204 F.3d at 527 (quoting Westvaco, 171 F.3d at 974 (some
internal quotation marks omitted)); Apex, 142 F.3d at 193.

        As one might gather from the foregoing discussion, "[a]
court sits to 'determine only whether the arbitrator did his job
-- not whether he did it well, correctly, or reasonably, but
simply whether he did it.'" U.S. Postal Service v. American
Postal Workers Union, AFL-CIO, 204 F.3d 523, 527 (4th Cir. 2000)
(quoting Mountaineer Gas, 76 F.3d at 608).  In Mountaineer Gas,
our court of appeals provided guidance for a reviewing court
attempting to determine if the job was done:

>      When determining whether the arbitrator did his job,
>      this court examines: (1) the arbitrator's role as
>      defined by the CBA; (2) whether the award ignored the
>      plain language of the CBA; and (3) whether the
>      arbitrator's discretion in formulating the award
>      comported with the essence of the CBA's proscribed
>      limits.  _

Mountaineer Gas, 76 F.3d at 608.

        Despite the admonition to tread lightly during the
review process, implicit in these three guideposts from
Mountaineer Gas is the fact that the deferential review process
is yet infused with some limits.  One paramount consideration for

9

a reviewing court is the rule that the contents of the applicable collective bargaining agreement control, without supplementation by the arbitrator.[2]  See <u>U.S. Postal</u>, 204 F.3d at 530, 527 ("Parties to a collective bargaining agreement get what they bargain for -- no less and no more. If the APWU wished probationary employees to have access to the grievance procedure to challenge a separation, it could have bargained for such a right. Indeed, the APWU remains free to bargain for this right in the future. But the APWU cannot gain through arbitration what it could not acquire through negotiation."); <u>Westvaco</u>, 171 F.3d at 978; <u>Mountaineer Gas</u>, 76 F.3d at 608.

Indeed, our court of appeals has additionally observed that an arbitrator's award "'is legitimate only so long as it draws its essence from the collective bargaining agreement.  When the arbitrator's words manifest an infidelity to this obligation,

---

[2]Our court of appeals, however, has not limited arbitrators to the explicit language of the contract, recognizing the interpretive role of the neutral arbiter.  See <u>Rock-Tenn Co.</u>, 184 F.3d at 337 (upholding arbitration award because "The collective bargaining agreement can fairly be read as the arbitrator interpreted it . . . ."); <u>Norfolk & Western Ry. Co. v. Transportation Communs. Int'l Union</u>, 17 F.3d at 701 ("This assumption of an incidental power was well within the Board's discretion, as the parties had effectively ceded to the arbitrators the task of defining the scope of their power by providing in the contractual language little guidance to the arbitrators as to their powers.").

courts have no choice but to refuse enforcement of the award.'"
U.S. Postal, 204 F.3d at 527 (4th Cir. 2000) (quoting Enterprise
Wheel, 363 U.S. at 597); see also District 17, 179 F.3d at 137;
Westvaco, 171 F.3d at 975; Champion, 168 F.3d at 728; Island
Creek, 29 F.3d at 129.

       At its core, the requirement that the award draw its
essence from the parties' agreement means that "'[t]he arbitrator
may not ignore the plain language of the contract.'"  U.S.
Postal, 204 F.3d at 527 (quoting Misco, 484 U.S. at 38);
Champion, 168 F.3d at 729 ("One way to test the validity of an
arbitration award on this basis is to ask 'whether the award
ignored the plain language of the [collective bargaining
agreement].'") (quoted authority omitted).

       Hearkening back to the second factor of the Mountaineer
Gas inquiry, "[w]hen the arbitrator ignores the unambiguous
language chosen by the parties, the arbitrator simply fails to do
his job."  U.S. Postal, 204 F.3d at 527 (quoting Enterprise
Wheel, 363 U.S. at 597); see also Mountaineer Gas, 76 F.3d at
610; Champion, 168 F.3d at 729; Norfolk & Western, 17 F.3d at
700.  In sum, the arbitrator is "'confined to interpretation and
application of the collective bargaining agreement.'" U.S.
Postal, 204 F.3d at 527 (quoting Enterprise Wheel, 363 U.S. at

11

597); <u>Champion</u>, 168 F.3d at 728.

When an arbitrator strays from the language of the applicable collective bargaining agreement, he must face the specter that he allowed his personal views to interfere with his neutral role.  Such an overspill is often fatal to an award, in view of the well-settled proposition that "[a]n arbitrator does not have carte blanche . . . to 'dispense his own brand of industrial justice.'" <u>U.S. Postal</u>, 204 F.3d at 527 (quoting <u>Enterprise Wheel</u>, 363 U.S. at 597); <u>see</u> <u>also</u> <u>District 17</u>, 179 F.3d at 137; <u>Westvaco</u>, 171 F.3d at 975; <u>Champion</u>, 168 F.3d at 728; <u>Mountaineer Gas</u>, 76 F.3d at 610 ("By fashioning an entire new remedy and infusing his personal feelings and sense of fairness into the award, the arbitrator created an award that failed to draw its essence from the CBA . . . ."); <u>Island Creek</u>, 29 F.3d at 129.

In addition to the naked language of the applicable collective bargaining agreement, the arbitrator is also generally charged with considering accumulated arbitral precedent.  <u>See</u> <u>CSX Transp.</u>, 29 F.3d at 939 ("clear evidence of past practice and "common law of the industry" must be considered by the arbitrator.").  This requirement is particularly significant in most coal arbitration cases in view of the inclusion of Article

12

XXIII(k) within the Agreement:

    (k) Prior Agreement

    All decisions of the Arbitration Review Board [("ARB")]
    rendered prior to the expiration of the National
    Bituminous Coal Wage Agreement of 1978 shall continue
    to have precedential effect under this Agreement to the
    extent that the basis for such decisions have not been
    modified by subsequent changes in this Agreement.

(Agreement, Art. XXIII(k)[3]; see also District 17, 179 F.3d at 138

n.1 (observing that, via Article XXIII(k), ARB decisions are

"[i]ncorporated into the" Agreement)[4]; Island Creek Coal Co. v.

Local Union 1640, 28 F. Supp.2d 994, 998 (W.D. Va. 1998) (noting

"the ARB decision . . . has the same authority as the language of

the Agreement . . . ."); Clinchfield Coal Co. v. District 28,

UMWA, 45 F. Supp.2d 513, 515 (W.D. Va. 1998) (stating under a

nearly identical provision that "ARB decisions apparently are

---

[3]One commentator has noted that "[t]his provision has
contributed to the continuing uniformity of coal decisions."
Calvin W. Sharpe, A Study of Coal Arbitration Under the National
Bituminous Coal Wage Agreement Between 1975 and 1990, 93 W. Va.
L. Rev. 497, 590 (1991).  Although it experienced an abbreviated
life span, the decisions of the ARB appear to have a positive and
profound effect on arbitration under the Agreement.  Id. at 502-
03 ("While the ARB issued only 207 decisions during its seven
year tenure,  available evidence shows that the ARB was
influential in producing greater consistency in arbitral decision
making under the Agreement.  The residual influence of ARB
decisions has continued and increased since the expiration of the
1978 Agreement. . . . Remarkable is the residual impact of ARB
precedents, reflected in the increasing adherence of panel
arbitrators to those decisions since 1981.").

[4]District 17 is the only published decision from our court
of appeals that discusses Article XXIII(k).

13

binding precedent.").

Nevertheless, when confronted with an allegation that an arbitrator intentionally ignored binding precedent, a reviewing court may consider whether the omission was in fact of the significance attributed to it by the challenger.  See District 17, 179 F.3d at 141 (4th Cir. 1999) ("Because the facts on which these two arbitrators made their determinations were not the same, we find that ARB 78-24 was inapplicable here. Arbitrator Ross was correct in making his own factual findings and fashioning a unique award.  The facts with which he was presented were unique and required individual treatment. . . . Because we think ARB 78-24 did not apply here, Arbitrator Ross' refusal to rely on it was proper and does not prove that his award was premised on his own notions of justice.").

Often a party aggrieved by an arbitration award will challenge not only the arbitrator's finding of a bargaining-agreement violation but also the chosen remedy for the offense. As noted in Enterprise Wheel, the arbitrator undeniably has broad discretion in fashioning appropriate relief once he finds a contract violation.  Enterprise Wheel, 363 U.S. at 597 ("When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to

14

bear in order to reach a fair solution of a problem.  This is especially true when it comes to formulating remedies.").  The decision in <u>Enterprise Wheel</u> is, however, not without its limits. <u>See</u> <u>Norfolk & W. Ry. Co. v. Brotherhood of Ry., Airline and S.S. Clerks, Freight Handlers, Exp. and Station Emp.</u>, 657 F.2d 596, 602 (4th Cir. 1981) (stating "the union, in reliance on <u>Enterprise Wheel</u>, argued that . . . an arbitrator should be given virtually unlimited latitude in fashioning a remedy.  We found, however, that "[n]othing said in <u>Enterprise Wheel</u> negates the requirement that compensatory damages be based upon cognizable loss causally traceable to breach.") (quoted authority omitted).

Our court of appeals has several times discussed one such remedy limitation.  Most recently in <u>Island Creek</u>, it was stated that, "[a]bsent an express provision in the collective bargaining agreement, the law of this circuit does not permit an arbitrator to impose a punitive award or punitive damages." <u>Island Creek</u>, 29 F.3d at 129 (4th Cir. 1994) (citing <u>Cannelton Indus., Inc. v. District 17</u>, 951 F.2d 591, 594 (4th Cir. 1991); <u>see also</u> <u>Norfolk</u>, 657 F.2d at 602; <u>Westinghouse Elec. Corp., Aerospace Div. v. International Bhd. of Elec. Workers</u>, 561 F.2d 521, 523-24 (4th Cir. 1977).  That conclusion is of significance here inasmuch as the court of appeals has explicitly observed, in

15

reviewing a prior version of the Agreement, that "[t]he NBCWA does not expressly provide for an award of punitive damages." <u>Island Creek Coal Co. v. District 28, United Mine Workers of America</u>, 29 F.3d 126, 128 (4th Cir. 1994).[5]

An examination of circuit precedent guides the determination of what constitutes an impermissible punitive award.  For example, in <u>Island Creek</u> the arbitrator imposed "[a] penalty for failure to obey the Cease and Desist order . . . in the amount of $1,000 <u>to be paid to the Union</u>."  <u>Island Creek</u>, 29 F.3d at 129 (emphasis supplied).  The court of appeals struck the sum, reasoning as follows:

> [T]here is little doubt that the $1000 award in this case is punitive. Arbitrator Cantor awarded the individual grievant compensation for invasion of his work time.  <u>Entitlement to compensatory damages for contract breach rests on a party's suffering "some legally cognizable loss, be it manifestly monetary or measurable in monetary terms." There is nothing in the record establishing this award as compensatory. Moreover, we regard as further evidence of the punitive nature of the award the fact that the $1000 payment was to be made to Local 2232 rather than to any individual grievant. As a result, the award issued by Arbitrator Cantor is punitive</u>. Because the NBCWA contained no express provision allowing the award of punitive damages, the punitive damage award issued by Arbitrator Cantor did not draw its essence from the collective bargaining agreement, and therefore, cannot be sustained.

---

[5]Neither party suggests punitive damages are available under the version of the Agreement presently under consideration.

16

. . . .

In the instant case, [the] [a]rbitrator . . . awarded
the individual grievant compensation <u>for the invasion
of his work time, and no other actual damages were
shown</u>. Therefore, although [the] [a]rbitrator . . .
considered the award nonpunitive, it is in fact
punitive.

<u>Id.</u> at 130-31 and n.7 (citation omitted).

In addition to <u>Island Creek</u>, our court of appeals has
struck similar awards it deemed as purely punitive.  <u>See</u>
<u>Cannelton</u>, 951 F.2d at 595 (involving (1) arbitral finding of
violation of prior award for failure to notify the union before
hiring of an outside contractor, and (2) arbitrator's issuance of
a monetary award which the union characterized as compensatory
and the employer characterized as punitive and the court of
appeals holding it was "[un]clear . . . [whether the award was]
money damages because Cannelton violated the [prior award's]
notice requirements . . . or [instead] <u>because Cannelton violated
the NBCWA by contracting out work that union employees should
have performed.  If . . . the former reason . . . the award is
purely punitive</u> and it does not draw its essence from the
NBCWA.") (emphasis supplied) ; <u>Baltimore Reg. Jt. Bd. v. Webster
Clothes</u>, 596 F.2d 95, 98 (4th Cir. 1979) (involving a collective
bargaining agreement breach and an $80,000 award, despite the
fact the grievants had been working full-time and suffered no

17

actual loss as a result of the breach and the court of appeals
vacating the $80,000 payment and reasoning "[t]he award of
damages . . . does not draw its essence from the . . . agreement,
for . . . [its] essence does not contemplate punitive, but only
compensatory awards . . . . In the absence of any provision for
punitive awards, and of any substantiating proof of willful or
wanton conduct, an arbitrator may not make an award of punitive
damages for breach of a collective bargaining agreement.")
(emphasis supplied); Westinghouse, 561 F.2d at 523 (involving a
lack of employees who suffered an economic loss and an award
commanding the employer to pay three additional days of vacation
and the court of appeals vacating the award because, "[t]hough
nominally compensatory, the award was actually punitive. Because
no provision of the contract warranted this punishment, the
arbitrator exceeded his jurisdiction."); see also District 17,
Dist. 29, Local Union 7113, and Local Union 6023, United Mine
Workers of America v. Allied Corp., 735 F.2d 121, 127 (4th Cir.
1984) ("Webster and Westinghouse  . . . both hold that an
arbitrator's award is not sustainable where the damages awarded
exceeded any monetary loss caused by breach of the collective
bargaining agreement. . . . "'It is clear that in order to be
entitled to compensatory damages for contract breach, a party
must have suffered some legally cognizable loss, be it manifestly

18

<u>monetary or measurable in monetary terms</u>.'") (quoted authority omitted) (emphasis supplied).

Among the foregoing decisions, a quotation from <u>Westinghouse</u> is particularly noteworthy in relation to the facts presented here: "With respect to vacation shutdowns, compensatory damages may be awarded only when a breach of the bargaining agreement causes a monetary loss." <u>Westinghouse</u>, 561 F.2d at 523.

Beyond these decisions from our court of appeals, it is also noted herein that ARB decisions are binding and, indeed, incorporated into the Agreement by Article XXIII(k). This principle is significant inasmuch as the ARB has indicated that just compensation must be the focus of any damage award under the Agreement. Indeed, in reviewing a prior award issued by the very arbitrator in this action, the ARB made the following observations:

> [W]hile sustaining the Grievance to the extent of observing the contract violation, Arbitrator Render denied the Union's request for pay inasmuch as the Union failed to prove the amount of time the outside contractor spent working on Bargaining Unit work as distinguished from agricultural work. . . . Accordingly, the Arbitrator denied the Union's request for a monetary award.
>
> On appeal, the Union says this was error. Yet, the job of the Arbitrator is to respond to the evidence presented by the parties and to award damages <u>in cases of observed losses</u>. The request for a make-whole

> **remedy must be supported by evidence which provides a**
> **firm basis for an award and avoids the necessity of**
> **undue speculation**.  Under the circumstances, the
> Arbitrator may not be found to have erred.

(ARB 78-60 at 3-4 (emphasis supplied); <u>see</u> <u>also</u> ARB 78-26 at 16).


B.   The Summary Judgment Standard


        A party is entitled to summary judgment "if the

pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  In opposing each other's motion for

judgment, neither Eastern nor the union alleges that there exist

genuine issues of material fact.


                              IV.


        As noted, the award of an unknown, and perhaps

substantial, sum of damages is based here solely upon a brief

statement in the award: "the union is entitled to be compensated

for the amount of the time that the outside contractor spent

tearing out the concrete and removing it from beneath the 437

20

belt." (Award at 21). Cognizant of the extraordinary deference accorded to arbitral awards, the foregoing remedy language is troubling in several respects. First, it does not spring from any associated findings regarding which, if any, classified employees suffered a monetary loss resulting from the Agreement's violation. Second, as rejected in Island Creek, payment is directed to the union rather than any individual grievant. Island Creek, 29 F.3d at 131. Third, the award is pegged not to classified-employee lost time but rather to the time that "the outside contractor spent tearing out the concrete and removing it from beneath the 437 belt." (Award at 21).

The utter absence of supporting findings, along with some of the chosen remedy language, leads one to conclude the award is a punitive judgment designed not to compensate for actual losses but to punish Eastern's invasion of classified employee work time. As presently structured, then, the award does not draw its essence from the Agreement. Judicial restraint is appropriate, however, based upon settled precedent governing the review of arbitral decisions and a reading of the award in its entirety.

Specifically, five separate considerations suggest the arbitrator did not definitively resolve the issue of what, if any, compensatory award would be appropriate. First, the

21

arbitrator noted, without further development, the union's
position that 24 classified employees were not permitted to work
during the vacation shutdown.  Second, the award observes the
grievants' explicit request for a make-whole remedy.  Third, the
award notes the testimony of one classified employee claiming to
have been denied the opportunity to work during the vacation
period.  Fourth, the very language chosen by the arbitrator
contains the word "compensated[,]" albeit without further
development.   Fifth, Mr. Jarrell testified that, in the past,
Eastern had summoned classified employees to work during a
vacation period and that those employees were able and competent
to perform the grieved work now under consideration.  Findings
based upon these types of considerations might justify a
compensatory award.  Again, however, the lack of any present
findings on the matter leaves the issue open and prevents the
court from discharging its responsibilities on review.

        The union nevertheless contends the award should stand.
It notes that governing precedent allows an arbitrator to leave
to the parties the calculation of the amount of the award and its
appropriate distribution.  The argument is unavailing.  The
matters of liquidation and distribution are of little moment
given the lack of supporting findings indicative of a

compensatory, rather than a punitive, award.[6]

The union also notes the arbitrator's recognition of its position under the heading in his award of "Position of the Union" which mentions the loss of work by 24 bargaining unit employees and its requested make-whole remedy.  The union appears to suggest that this reference is an implicit consideration, and resolution in the union's favor, of the issue of compensatory damages.  The argument proves too much.  See Clinchfield Coal, 720 F.2d at 1369 ("The Union responds on appeal by noting that Arbitrator Ables was aware of the 'coal mining operations or coal lands' issue because he listed it as one of the four questions raised by Clinchfield. The Union then argues that '[h]aving stated the company's position, it is clear by virtue of his award

_____

[6]The union cites two decisions putatively supporting the award, arbitration case number 88-31-94-982 and an unpublished decision from this court.  The arbitration case is wholly distinguishable.  Among other things, the decision discloses that (1) the arbitrator there took great pains to assure the award was compensatory (see Arbit. Decis. at 15-22); (2) he specifically noted that a failure to "award the remedy . . . would be to ignore a cognizable and proven loss of overtime work opportunities[;]" (3) he found the company was uncooperative in providing the union certain information that would have enhanced the compensatory nature of the award; and (4) he offered a specific, arguably compensatory formula by which to calculate applicable damages.  None of those key elements are present here. The same observation holds with respect to the cited unpublished decision from this court.  A cursory reading of that opinion discloses its compensatory roots.  Were the case otherwise, however, the decision does not constitute precedent.

that he rejects it, although his decision does not develop his reasons in detail.' . . . The Union's argument is wholly unsatisfactory for it would allow an arbitrator to shield his award simply by the ruse of stating an issue without discussing it.").

Having rejected the union's arguments in support of the award, the present uncertainty yet suggests it would be improper to conclusively foreclose at this juncture the arbitrator's ability to address the as-yet unresolved damages issue.  Under the unusual circumstances presented, the court concludes the interests underlying the restricted review of arbitral awards is best served by following our court of appeals' decision in Cannelton:

> A court's power to vacate an award because of an arbitrator's failure to address a crucial issue necessarily includes a lesser power to remand the case to the same arbitrator for a determination of that issue. . . .

> We must be concerned not to broaden the scope of judicial review of arbitration decisions nor to lengthen a process that is intended to resolve labor disputes quickly. But in this case we are not in a position to determine whether Basial's monetary award drew its essence from the agreement without an arbitral decision as to whether Cannelton's outside contracts violated sections (g)(2) and (I) of Article 1A of the NBCWA.

> For the above reasons, we vacate the judgment of the district court which vacated Arbitrator Basial's award and remand the cause to the district court for

24

> further proceedings. On remand, the district court is
> instructed to reinstate the unchallenged portion of the
> arbitrator's award which ruled that Cannelton had
> violated the prior notice obligation imposed by the
> Volz Award.  In addition, the district court is
> instructed to remand the remainder of the grievance to
> the arbitrator for a determination whether the outside
> contract work, which is the subject of the grievance,
> violated the NBCWA in any way justifying a compensatory
> award.

Cannelton, 951 F.2d at 594-95 (emphasis supplied).

As noted, Enterprise Wheel accords the arbitrator broad discretion in fashioning appropriate relief once he finds a contract violation.  Enterprise Wheel, 363 U.S. at 597. Nevertheless, compensatory damages must be based upon cognizable loss causally traceable to the breach.  Norfolk, 657 F.2d at 602.

Our court of appeals' precedent draws a figurative line in the sand when an award appears to tread beyond settled notions of compensation.  Under the unusual circumstances presented here, where the issue of damages is practically left open without discussion, Cannelton teaches by analogy that remand is the best course.  Remand will allow (1) the arbitrator to illuminate the basis for his unliquidated monetary award, and (2) then permit the court to discharge its limited review function if a further challenge is made.

Based upon the foregoing discussion, the court ORDERS that the March 23, 2004, award be, and it hereby is, enforced insofar as it finds a violation of the Agreement but vacated as to the chosen remedy and remanded for consideration of the remaining damages issue.  The respective motions for summary judgment of the plaintiff and the defendants are ruled upon accordingly.  It is further ORDERED that this action be, and it hereby is, dismissed without prejudice and stricken from the docket.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record and the arbitrator.

DATED: September 28, 2006

John T. Copenhaver, Jr.
United States District Judge

26